OPINION OF THE COURT
Budd G. Goodman, J.
In these two cases of first impression, this court must determine whether the evaluation, making and rendering of diagnoses and prognoses, formulating treatment plans and the treatment of mental disorders or of mental, emotional and behavioral symptoms which, either in whole or in part, are or may reasonably be assumed to be organic in nature or which may result to some degree from a concurrent physical ailment or dysfunction, are within the scope of practice of the professions of psychology and social work. For the reasons set forth below, this court finds that such professional functions are within the scope of practice of psychologists and licensed clinical social workers as set forth in the newly enacted articles 153 *163 and 154 of the Education Law, which took effect on September 1, 2003 and September 1, 2004, respectively.
Statement of the Cases
In the first case, the defendant, R.R., a 42-year-old man with a history of depression, epilepsy and head trauma from a mugging, all predating the instant offense, was arrested and charged with assault in the first degree stemming from an incident during which a number of persons were engaging in an altercation and he stabbed another individual causing serious physical injury. At the request of defense counsel, this court ordered an evaluation of this defendant’s competence to proceed pursuant to CPL article 730. The defendant was examined by a psychiatrist and a psychologist on the staff of the Court Clinic who opined that the defendant was an incapacitated person as the result of a likely dementia secondary to head trauma with resultant cognitive deficits. After reviewing the reports from the Court Clinic and conferring with the prosecutor and defense counsel regarding their concerns about the quality of the reports, this court ordered an examination of the defendant by Hillel Bodek, a clinical social worker with significant experience in the evaluation and treatment of persons suffering from neuropsychological dysfunction and concurrent mental illness,[1] as the court’s expert, to determine the nature and extent of any mental disorders from which he might suffer and how these impact on his competence to stand trial.[2]
In the second case, the defendant, G.A., a 60-year-old man who had no prior history of mental health problems, was *164 charged with the crimes of kidnapping in the second degree and endangering the welfare of a child (two counts) stemming from an incident where he took a child less than two years of age from a baby stroller without permission of the caretaker, took the child into the building where his sister resided and went up to her apartment where she told him to return the child from where he had taken him. He was arrested by police officers who had responded to the scene when they observed him bringing the child back downstairs. At the time of his arraignment in criminal court, the court ordered that he be examined pursuant to CPL article 730. He was examined at the Court Clinic and found not competent to proceed because of dementia. He was committed to the Commissioner of Mental Health. When evaluated at Kirby Forensic Psychiatric Center, the defendant was determined to be suffering from an HIV infection. He was started on anti-retroviral and anti-psychotic medications. He was restored to competence to proceed. When he returned from Kirby and appeared before this court, defense counsel served notice that he intended to interpose a defense of lack of criminal responsibility by reason of mental disease or defect in this case. Several adjournments later, after a bench conference with defense counsel and the prosecutor, this court appointed Mr. Bodek to perform, as the court’s expert, a comprehensive prepleading examination of the defendant to include an assessment of whether this defendant lacked criminal responsibility by reason of mental disease or defect.[3]
*165 After this court appointed Mr. Bodek in these two cases, it learned of the newly enacted licensing statutes. This court made defense counsel and the prosecutors aware of those statutes and asked them to indicate if they believed these statutes should affect the court’s appointment of Mr. Bodek in these cases.[4]
Defense counsel for defendant R.R. reviewed the statutes and notified this court that
“it is my belief that these new statutes significantly impact on the practice of psychologists and clinical social workers. These new statutes strictly limit the scope of psychology and clinical social work practice to matters that are squarely within the four corners of mental, emotional and social functioning. These statutes clearly and unambiguously preclude psychologists and clinical social workers from making diagnostic or prognostic assessments about any physical illness or infirmity or any mental disorders which, either in whole or in part, are or may reasonably be assumed to be organic in nature or which result to some degree from a concurrent physical ailment or dysfunction.”[5] He asked that “Mr. Bodek be relieved and that the Court appoint a board cer *166 tilled psychiatrist, preferably one who has some experience in working with persons suffering from neuropsychiatric impairments due to brain damage, to replace him in this case.”[6]
Noting that one of the CPL article 730 evaluations was performed by a psychologist, defense counsel for R.R. argued vigorously that
“the diagnosis of dementia is clearly outside the scope of Dr. Larino’s license as a psychologist. Although either Dr. Larino or Mr. Bodek, to the extent *167 they are competent to do so, may within the scope of their respective licenses administer tests and measures of [R.R.’s] psychological — mental and emotional — functioning and conduct interviews to determine that [the defendant] has cognitive impairments or intellectual limitations, neither of them may diagnose that he has dementia or make a prognostic statement regarding if or when his cognitive impairments, to the extent that they are due to brain damage, are likely to improve because such diagnoses and prognoses are outside the scope of practice in their respective licenses. Accordingly, I request that Dr. Larino’s report be stricken, and that the Court Clinic be directed to designate a second qualified psychiatrist, a professional who is legal [ly] authorized by his or her statutory scope of practice as a physician to examine this defendant who presents with a mental disorder that, either in whole or in part, is due to physical ailment or dysfunction.”[7]
Defense counsel for defendant G.A. took the position that, “excluding the diagnosis and treatment of physical/biological conditions, the defense reads nothing in the statute to prohibit Mr. Bodek from considering the presence of physical or biological conditions, once properly diagnosed, in relation to the maintenance and enhancement of [the defendant’s] health.” The People took no position with regard to the substantive issue presented.
This court initially ruled that the examinations by Mr. Bodek could proceed, subject to a final determination by this court after the regulatory process by the Education Department with regard to the new licensing laws for the professions of psychology and social work and for the newly created category of mental health practitioners was completed, and *168 the reports of Mr. Bodek’s evaluations were received by this court which would set forth his diagnoses and how he arrived at them.[8]
Statutory History
In 2002, the Legislature enacted new laws licensing the practice of psychology and social work, as well as licenses for four new groups of mental health practitioners (mental health counselors, marriage and family therapists, creative arts therapists and psychoanalysts), with the goal of enhancing public protection by limiting the provision of mental health services to persons with demonstrated knowledge and skills that qualify them to do so, and by establishing mechanisms of accountability for such practitioners by licensing their practices. Prior to that time, New York State only protected the use of the titles psychologist and certified social worker. It did not license the practice of psychology or of social work or the rendering of psychological or social work services.[9]
*169 The initial psychology statute was enacted in 1956. (L 1956, ch 737, § l.)[10]
“Drafted by State agencies and interested professional groups, and widely approved by the psychological fraternity, article 153 is a certification rather than a licensing law, i.e., it does not prohibit anyone from rendering psychological services, but proscribes the professional use by noncertificants of the title ‘psychologist’ and its derivatives, for remuneration. Section 7602 prohibits noncertified individuals from representing themselves as psychologists, and section 7601 defines a person who ‘represents himself to be a “psychologist” ’ as one who ‘holds himself out to the public by any title or description of services incorporating the words “psychological”, “psychologist” or “psychology”, and under such title or description offers to render or renders services to individuals, corporations, or the public for remuneration.’ ” (National Psychological Assn. for Psychoanalysis, supra, 8 NY2d at 200-201 [citation omitted].)
Indeed, until the enactment of the current licensing statute for psychologists in 2002, article 153 of the Education Law provided no definition of the practice of psychology. As the Court of Appeals noted,
“[t]he omission of a formal definition of ‘psychology’ or its variants was no legislative oversight. Attempts to draft a definition that would sufficiently delineate the nature and scope of psychology had failed, and, as noted by Special Term, ‘the law was enacted in a form that was acceptable to interested groups and that requires no interpretation of that term for its enforcement.’ ” (8 NY2d at 203 [citation omitted].)[11]
*170 The initial social work statute was enacted in 1965. (L 1965, ch 334, § l.)[12] It contained a statutory definition of the practice of social work.[13]
The New Psychology and Social Work Licenses
In order to resolve the issue presented here, this court must first analyze the scope of practice provisions of the new licensing statutes for the professions of psychology and social work.
The new psychology statute, chapter 676 of the Laws of 2002, became effective on September 1, 2003.[14] Unlike the new social *171 work statute, the new psychology statute does not directly distinguish between clinical and nonclinical psychologists.[15] However, the scope of practice contained in that statute is, unlike that in the new social work statute, wholly clinical in nature. The new social work statute, chapter 420 of the Laws of 2002, became effective on September 1, 2004. It licenses two tiers of social work practice, licensed master social work,[16] and *172 \licensed clinical social work.[17] The scope of practice of licensed master social work is included in the larger scope of practice of *173 licensed clinical social work. (See, Education Law § 7701 [2] [a].) Whereas licensed clinical social workers are authorized to make and render diagnoses and the prognoses which flow from and are intimately related to them, administer and interpret tests and measures of psychosocial functioning (so-called psychodiagnostic testing, which includes the testing of the relationship between mental, emotional and behavioral functioning and brain functioning, often referred to as neuropsychological testing), develop and implement assessment-based treatment plans and provide all forms of psychotherapy, licensed master social workers are only permitted to perform psychosocial assessments and evaluations[18] and may not make or render diagnoses or prognoses, may formulate and develop service plans as opposed *174 to treatment plans,[19] may administer but not interpret tests and measures of psychosocial functioning, and may provide counseling[20] but not psychotherapy. However, licensed master social workers may render the clinical services and perform the clinical functions that are within the scope of the practice of licensed clinical social work when they do so under the supervision of a psychiatrist, psychologist or licensed clinical social worker. (See, Education Law § 7701 [1] [d]; 8 NYCRR 74.6; n 25, infra.)
In analyzing the new social work statute, this court is faced with a potential conflict of laws. Subdivision (1) of section 7702 of the new social work licensing statute provides that “[i]n addition to the licensed social work services included in subdivisions one and two of section seventy-seven hundred one of this article, licensed master social workers and licensed clinical social workers may perform the following social work functions that do not require a license under this article” (emphasis supplied). *175 It is unclear why a licensing law includes a provision which identifies 12 specific functions which may be carried out without a license;[21] in other words, can be legally performed by anyone. This is further complicated because all of those 12 functions are already mentioned directly or otherwise incorporated as part of *176 services set forth in subdivision (1) of section 7701,[22] and thus are not in addition to the services set forth in that subdivision. This court must determine how a service listed in the scope of practice of licensed master social work does not require a license. In addressing a potential conflict between two provisions of law, a court has the obligation to attempt to resolve the conflict to the extent possible in a manner that resolves the conflict and leaves the statutes intact.
This court finds that in regard to functions (a), (d), (g) (other than to the extent that it involves providing case management), (b), (Z), (c), (k) and (h), these functions which are administrative, management, research, nonclinical supervision and educational in nature, were not necessarily intended to require a license. However, when they are provided by a licensed professional social worker, there is a legally imposed expectation by virtue of licensing that the various skills and knowledge of a licensed professional social worker will inform and guide the process of carrying out these functions. Further, by virtue of licensure, there is a legally imposed element of professional accountability, not just to the clients and employers of the social worker but, more important, to the standards and integrity of the social work profession and to society for the manner in which those services are provided and for the quality of those services, which is legally cognizably different from when these services are provided by a nonlicensed person or professional.
This court further finds that with regard to functions (e), (i), (g) (insofar as it involves providing case management), and (j), assisting clients in obtaining/accessing services, there is a legally cognizable difference between the process of a licensed professional social worker assessing a client’s or patient’s needs, referring a client or patient for services and/or providing case management,[23] and a nonprofessional referring someone for services and attempting to help a person obtain help from one or more sources. A licensed professional social worker has a professional *177 obligation, legally imposed by licensure and the standards of care pertaining to the provision of professional social work services, to make a professional assessment in order to determine the appropriate referral(s) and prioritize them along with other interventions, to obtain the client’s informed consent before making a referral, and to do so as part of a professional helping relationship in partnership with the client in which the social worker is accountable for the quality of the professional services he or she is providing; whereas a nonprofessional would simply make the referral based on the referee’s stated need (e.g., a friend refers a friend who has been regularly drinking in excess to Alcoholics Anonymous based on his or her assessment of what is obvious to them as the friend’s need. However, a professional social worker would perform a psychosocial or clinical assessment to determine the range of problems requiring assistance and the various services which may be indicated. He or she might determine that the client is severely depressed and anxious, having lost his job and going through a divorce. He or she might then refer the client to a psychiatrist for antidepressant medication, see the client for psychotherapy if he or she is a licensed clinical social worker, or if he or she is a licensed master social worker, refer the client to a clinical social worker for psychotherapy with the goal of stabilizing the client, and then later refer the client for job placement and to a divorcing fathers support group; all of this being done while providing support, encouragement, education and guidance within the context of a professional therapeutic relationship). Thus, the *178 process of assessing and evaluating a person’s presenting problems, formulating a plan based on the person’s needs, obtaining informed consent, making referrals and providing case management by a professional social worker should be a licensed function, while a nonprofessional doing so, simply trying to help someone with one or multiple problems, would not be held to the same standard and is doing so simply trying to be helpful, something that is not a licensable function.
This court further finds that with regard to function (i), providing social work advocacy, there is a legally cognizable difference between a community activist, an interested friend or a volunteer advocate advocating for a single client or group of clients, and a licensed professional social worker doing so. In addition to professional accountability, a professional social worker, by virtue of licensure, would be required to obtain informed consent for the advocacy services he or she provides based on assessment of the client’s needs and actual entitlements, and would not be able to proceed simply based on a dogooder’s belief of what the person he or she is advocating for needs or is entitled to.
Additionally, this court notes that a licensed master social worker or licensed clinical social worker
“shall not be required to disclose a communication made by a client, or his or her advice given thereon, in the course of his or her professional employment, nor shall any clerk, stenographer or other person working for the same employer as such social worker or for such social worker be allowed to disclose any such communication or advice given thereon.” (CPLR 4508 [a].)
Obviously, when the services and functions noted above are provided by a layperson rather than by a licensed social work professional, no such privilege exists.
Accordingly, this court determines that, based on the above analysis, no conflict exists between Education Law § 7701 (1) (a) through (c), which sets forth the scope of practice of licensed master social work, and Education Law § 7702 (1) (a) through (l), which provides that those same functions do not require a license when performed by persons who are not licensed professional social workers who are not held to the legally cognizable standards of care and professional accountability in providing such services to which professional social workers are held and whose relationships do not enjoy the licensed master social *179 worker and licensed clinical social worker client/patient privilege.
Determination of the Issue at Bar
Having analyzed the scopes of practice established by the licensing legislation enacted for the psychology and social work professions, this court now turns to addressing the question of whether evaluating, making and rendering diagnoses and prognoses (which of necessity flow from and are intimately related to diagnoses), formulating treatment plans and the treatment of mental disorders or mental, emotional and behavioral symptoms which, either in whole or in part, are or may reasonably be assumed to be organic in nature, or which may result to some degree from a concurrent physical ailment or dysfunction, are within these scopes of practice of the professions of psychology and social work.
At the outset, this court finds, as a matter of law, that in terms of clinical functions, the scope of practice of psychology and the scope of practice of licensed clinical social work, although described using some different words at times, do not vary in substance and are wholly equal and the same. Of course, the fact that a particular function is within the scope of practice of a profession does not mean that every person licensed to practice that profession is competent to carry out each of those functions. So, for instance, a person who is not trained in marriage therapy, even though he or she is a psychologist or licensed clinical social worker, should not practice that modality without being supervised or prior to obtaining proper training.[24]
Additionally, this court further finds, as a matter of law, that licensed master social workers may not make or render diagnoses or prognoses (which of necessity flow from and are intimately related to diagnoses), formulate or develop treatment plans, interpret tests and measures of psychosocial functioning, or provide psychotherapy unless they are doing so under the *180 supervision of a psychiatrist, psychologist or licensed clinical social worker.[25] (See, Education Law § 7701 [1] [d]; 8 NYCRR 74.6.) Thus, the instant legal issue does not apply to licensed master social workers unless they are providing clinical services under supervision, in which case they would be acting under the license of their respective clinical supervisors.
Defense counsel for defendant R.R. argues that neither the psychology license nor the licensed clinical social worker license authorizes the members of these professions to evaluate, make or render diagnoses and prognoses, formulate treatment plans and treat mental disorders or mental, emotional and behavioral symptoms which, either in whole or in part, are or may reasonably be assumed to be organic in nature or which may result to some degree from a concurrent physical ailment or dysfunction. In addition to his argument based on statutory construction and interpretation, he also argues that performing these functions is outside the scope of the training and competence of many psychologists and licensed clinical social workers.
Statutory Construction and Interpretation
Education Law § 7601-a (1) provides, in pertinent part, that the scope of practice of psychology includes “the diagnosis and treatment of mental, nervous, emotional, cognitive or behavioral disorders, disabilities, ailments or illnesses, alcoholism, substance abuse, disorders of habit or conduct, the psychological aspects of physical illness, accident, injury or disability, psychological aspects of learning (including learning disorders).” Education Law § 7601-a (2) defines diagnosis and treatment by psychologists acting within the scope of their license, in pertinent part, as “the appropriate psychological diagnosis and the ordering or providing of treatment according to need.” Education Law § 7701 (2) (a) provides, in pertinent part, that the scope of practice of licensed clinical social work includes *181 “the diagnosis of mental, emotional, behavioral, addictive and developmental disorders and disabilities and of the psychosocial aspects of illness, injury, disability and impairment undertaken within a psychosocial framework.” Education Law § 7701 (2) (b) defines diagnosis in the context of clinical social work practice as “the process of distinguishing, beyond general social work assessment, between similar mental, emotional, behavioral, developmental and addictive disorders, impairments and disabilities within a psychosocial framework on the basis of their similar and unique characteristics consistent with accepted classification systems.” Education Law § 7701 (2) (d) defines development of assessment-based treatment plans in the context of clinical social work practice as “the development of an integrated plan of prioritized interventions, that is based on the diagnosis and psychosocial assessment of the client, to address mental, emotional, behavioral, developmental and addictive disorders, impairments and disabilities, reactions to illnesses, injuries, disabilities and impairments, and social problems.”
Essentially, these statutes provide that diagnosis by psychologists is “the appropriate psychological diagnosis,” which leads to “the ordering or providing of treatment according to need[,]” and that diagnosis by licensed clinical social workers is undertaken “within a psychosocial framework[,]” and leads to “the development of an integrated plan of prioritized interventions, that is based on the diagnosis and psychosocial assessment of the client, to address mental, emotional, behavioral, developmental and addictive disorders, impairments and disabilities, reactions to illnesses, injuries, disabilities and impairments, and social problems.”[26] Defense counsel’s primary argument is based on the lack of any reference to a physical or biological element in these definitions of diagnosis. His reliance on this fact is misplaced and wholly unavailing.
First, beginning in 1980 with the publication of the Diagnostic and Statistical Manual of Mental Disorders — third edition (DSM III), the result of an effort that had commenced in 1974, the diagnosis of mental disorders was based on a multi-axial framework which reflected the evolving biopsychosocial approach to the understanding, diagnosis and treatment of physical and *182 mental disorders.[27] This multi-axial framework includes the diagnosis of mental disorders, identification of physical disorders, symptoms and conditions that are potentially relevant to the understanding and management of the patient, identification of psychosocial stressors judged to have been a significant contributor to the development or exacerbation of the current disorder and rating the severity of such stressors, and an assessment of the highest level of the patient’s adaptive functioning over the prior year and the patient’s current level of adaptive functioning.[28] (See, American Psychiatric Association, *183 Diagnostic and Statistical Manual of Mental Disorders, at 1-12 [Washington, D.C. 3d ed 1980].)
One need only to have read the Science Times (the New York Times weekly science section) over the past decade to know that physical, psychological and social functioning are inexorably linked. Mental processes, emotions, behavior and social functioning are impacted on by a myriad of biological processes, environmental factors, physical illnesses and pain. Physical functioning, pain and biological processes are impacted on by social and environmental factors, mental processes and emotions. In short, one cannot separate the mind, the body, the environment and social functioning from each other; each impacts on and influences directly and/or indirectly the functioning of the other.
The importance of accurate diagnosis cannot be overstated. It is the key to appropriate treatment planning which guides and drives the provision of appropriate and effective treatment. It is based on comprehensive and holistic assessment of the patient using a biopsychosocial model. Increasingly, mental disorders which were previously not thought to be related to any organic illness or dysfunction, such as personality disorders, posttraumatic stress disorder, anxiety, obsessive-compulsive disorder and others have been found to have contributing organic factors and to benefit from combinations of psychopharmacotherapy and psychotherapy. The diagnosis and treatment of almost all mental disorders and the assessment and treatment of the psychosocial responses to physical illnesses, pain and other symptoms, requires utilizing a comprehensive and holistic biopsychosocial approach to evaluation, diagnosis, treatment planning, care and treatment. Further, just as one cannot properly assess mental, emotional, behavioral and social functioning and diagnose such disorders without utilizing a comprehensive and holistic biopsychosocial approach which recognizes and addresses the dynamic and complex interaction between biological, psychological and social elements, one cannot properly assess and treat physical *184 illnesses, injuries and disabilities without considering the impact of those illnesses, injuries and disabilities on the psychosocial functioning of the patient, and the impact of the patient’s psychosocial response to illness, injury or disability on the treatment and clinical course (including prognosis) of the patient’s physical ailments.
The process of diagnosis, which is the first step in formulating a treatment plan and then providing appropriate treatment according to patient needs, requires identification of the potential causes of the presenting problem and symptoms. Thus, in order to assess psychological (mental, emotional and behavioral) and psychosocial (mental, emotional, behavioral and social) dysfunction, one must identify possible and probable causes of the symptoms and dysfunction in order to formulate an appropriate initial treatment plan (which may include conducting additional assessment or arranging for another health care professional to conduct additional assessment, as indicated). Accordingly, diagnosis, assessment and treatment planning require utilizing a comprehensive and holistic biopsychosocial approach.
By authorizing psychologists and licensed clinical social workers to diagnose and to formulate assessment-based treatment plans[29] independent of other disciplines, it must be presumed that the Legislature, which has not provided otherwise, intended that they carry out these tasks in accordance with the accepted standard of care of their professions for doing so, which mandates that diagnosis, assessment and treatment planning be *185 undertaken utilizing a comprehensive and holistic biopsychosocial approach.
This court finds that, as a matter of law, the failure of a psychologist or licensed clinical social worker to utilize a bio-psychosocial approach in the performance of diagnosis, assessment and treatment planning would constitute practice that, per se, violates the professional standard of care. This court further finds that, as a matter of law, psychologists and licensed clinical social workers, as licensed health care providers, are required by their scope of practice and the standards of care of their professions to gather information and make observations related to the physical condition and symptoms, health history, medications (prescribed, over the counter, and complimentary and alternative treatments) utilized, substance use and abuse, and allergies of their patients as part of their initial assessments and to be alert throughout the course of treatment to mental or physical symptoms which may have physical causes or portend the existence of physical illness, new health history, medications (prescribed, over the counter, and complimentary and alternative treatments) utilized, and substance use and abuse, so that these may be explored, their impact on the patient’s functioning assessed properly and treated, as necessary, through referral to or consultation with other health care professionals, as indicated. The failure to do so would constitute practice that, per se, violates the professional standard of care.
Second, Education Law § 7701 (1) (a) provides that
“[t]he practice of licensed master social work shall mean the professional application of social work theory, principles, and the methods to prevent, assess, evaluate, formulate and implement a plan of action based on client needs and strengths, and intervene to address mental, social, emotional, behavioral, developmental, and addictive disorders, conditions and disabilities, and of the psychosocial aspects of illness and injury experienced by individuals, couples, families, groups, communities, organizations, and society” (emphasis supplied).
The practice of licensed master social work is subsumed into the practice of licensed clinical social work. (See, Education Law § 7701 [2] [a].) The definition of clinical social work promulgated *186 by the American Board of Examiners in Clinical Social Work[30] at its inception in 1987 clearly provides that the biopsychosocial approach is an inherent part of the theory, principles and methods of clinical social work.[31] A search of the social work literature using the Social Work Abstracts database indicates that utilization of a biopsychosocial model has long been a key part of social work theory, principles and methods, with well over 100 articles in peer-reviewed journals and almost 25 books which address specifically the biopsychosocial approach in clinical social work practice.
Similarly, the American Board of Professional Psychology’s definition of the practice of clinical psychology makes it clear that the focus of clinical psychology practice includes diagnosis undertaken with consideration of the physiological component *187 of mental, emotional and behavioral disorders, for the purpose of addressing both mental and physical illness.[32] A search of the psychology literature reveals numerous articles and books which address the biopsychosocial approach in the field of clinical psychology.
Thus, it is clear that the use of the biopsychosocial approach is an inherent part of “social work theory, principles, and the methods,” which licensed clinical social workers are legally authorized to apply in their provision of professional clinical social work services, and is an inherent part of the theory, principles, and the methods of clinical psychology which psychologists are legally authorized to apply in their provision of professional psychological services.
Third, neither the lack of use of the term biopsychosocial in describing the professional functioning of psychologists and licensed clinical social workers in their licensing statutes nor the fact that those statutes do not specifically indicate that biological factors should be considered by psychologists and licensed clinical social workers in their professional practices can be interpreted as manifesting legislative intent that *188 psychologists and licensed clinical social workers may not use a biopsychosocial model, particularly given the fact that this model has been long endorsed by these professions as part of the standard of care and is essential to appropriate diagnosis and treatment planning.
Fourth, by examining statutes which govern the practices of other nonphysician health care professionals who are involved in providing services to address mental, emotional, behavioral and social dysfunction and disorders, it becomes clear that the Legislature did not proscribe the use of the biopsychosocial model by psychologists and licensed clinical social workers who, along with psychiatrists, represent the three historical core mental health disciplines.
In this regard, unlike psychologists and licensed clinical social workers who have broad scopes of practice, licensed mental health counselors,[33] licensed marriage and family therapists,[34] *189 licensed creative arts therapists[35] and licensed psychoanalysts[36] who are licensed collectively as mental health practitioners pursuant to article 163 of the Education Law which took effect on January 1, 2005 have very limited scopes of practice centered around skills in a particular area of clinical practice.
Of these four groups, licensed mental health counselors have the broadest scope of practice. They may provide counseling and psychotherapy, utilize assessment instruments, and assess the functioning of their clients, but may not make or render diagnoses or prognoses. (See, n 33, supra.) Licensed marriage and family therapists are clearly limited to assessing (including using assessment instruments) and treating in counseling and psychotherapy mental disorders in the context of relationship problems and their impact on relationships. They may not make or render diagnoses or prognoses. (See, n 34, supra.) Licensed creative arts therapists are clearly limited to the assessing (including using assessment instruments), evaluating, and providing therapeutic intervention in the form of using the creative arts and by using counseling and psychotherapy for the purpose of providing creative arts therapy to treat mental and developmental disorders. They may not make or render diagnoses or prognoses. {See, n 35, supra.) Licensed psychoana *190 lysts are clearly limited to assessing (including using assessment instruments) and treating in psychotherapy personality, behavior and interpersonal problems by addressing dynamic unconscious mental processes. They may not make or render diagnoses or prognoses. (See, n 36, supra.)[37]
*191 Additionally, mental health practitioners licensed pursuant to article 163 of the Education Law are deemed as a matter of law not to be competent to provide professional services to persons suffering from serious mental illness without physician consultation and are required to obtain medical consultation from a physician when they are treating a person suffering from a serious mental illness on a continuous and sustained basis so that the physician can determine and advise whether any medical care is indicated for such illness. (See, Education Law § 8407 [1] )[38] -phig statutory provision, necessary because these *192 practitioners may not make or render diagnoses or prognoses (which of necessity flow from and are intimately related to diagnoses), was clearly enacted, as are all legally appropriate professional licensing provisions, to assure the protection of the public.
For reasons that are not obvious in reviewing the record of the regulatory process in connection with the implementation of article 163 of the Education Law as contained in the State Register, even though the Education Department indicated on December 1, 2004 that “[t]he Department will consider addressing this issue, within the bounds of our statutory authority, in future amendments to the definition of unprofessional conduct” (NY Reg, Dec. 1, 2004, at 12 [with regard to licensed mental health counselor], 16 [with regard to licensed marriage and family therapists], 20 [with regard to licensed creative arts therapists], 24 [with regard to licensed psychoanalysts]), no regulations have been promulgated by the Department to guide the implementation of this crucial statutory provision that is critically essential for the protection of the public.
This court finds, as a matter of law, that mental health practitioners licensed pursuant to Education Law article 163 are not permitted to make or render diagnoses or prognoses (which flow from and are intimately related to diagnoses). In addition, in the absence of any regulatory guidance and noting the clear public protection basis for Education Law § 8407 (1), this court finds that whenever a licensed mental health practitioner who is evaluating or treating a client or patient has or should have a reasonable belief based on personal observations, examination and evaluation, reports of others, historical information, or past or current symptoms or behavior that the client or patient may suffer from a serious mental disorder, including a severe mental disorder that is chronic in nature and is in a period of remission, he or she must immediately require that the client or patient obtain a consultative evaluation by a licensed physician, preferably a psychiatrist, and make a referral for such consultative evaluation for the purpose of that physician making an appropriate diagnosis, determining whether the client or patient suffers from a serious mental illness, including a severe mental illness that is chronic in nature and in a period of remission, determining the appropriate treatment and formulating an appropriate treatment plan for the client or patient. Because of the nature of severe mental disorders where symptoms may wax and wane over time, a licensed *193 mental health practitioner must obtain medical consultation, preferably from a psychiatrist, on a regular and ongoing basis during the period that he or she provides professional services to such a client or patient, including periodic examinations by the physician as the physician deems appropriate. The licensed mental health practitioner’s treatment must be in complete accordance with and may not vary from the treatment plan formulated for the client or patient by the consulting or any treating physician(s). If the mental health practitioner’s client or patient declines to obtain medical consultative evaluation on a regular basis or to comply with the treatment plan recommended by the consulting or treating physician(s), the mental health practitioner must promptly cease treating the client or patient and must arrange for the care of the client or patient to be transferred promptly to the care of a psychiatrist or another licensed mental health professional who is not mandated statutorily to obtain physician consultation, collaboration or oversight, in such a manner as not to abandon the client or patient in need of care and treatment. Because of the potential for such a situation occurring, every licensed mental health practitioner must have a formal written agreement with one or more psychiatrists or other physicians to be able to provide promptly consultative evaluations of his or her clients or patients and with one or more psychiatrists, psychologists or licensed clinical social workers to assume the treatment of a client or patient whom he or she may not continue to treat because the client or patient declines to obtain medical consultative evaluation on a regular basis or to comply with the treatment plan recommended by the consulting or treating physician (s).
In the profession of nursing, registered professional nurses are clearly allowed to make nursing diagnoses that discriminate between physical and psychosocial signs and symptoms essential to effective execution and management of a nursing regimen, but which are distinct from a medical diagnosis. They are allowed to treat signs, symptoms and processes which denote the individual’s interaction with actual or potential health problems through such services as casefinding, health teaching, health counseling, and provision of care supportive to or restorative of Ufe and well-being, and executing medical regimens prescribed by a licensed physician, dentist or other licensed health care provider. However, nursing regimens must be consistent with *194 and may not vary from any existing medical regimen. (See, Education Law §§ 6901, 6902 [l].)[39] Thus, although they can diagnose mental disorders and provide counseling and psychotherapy pursuant to a physician’s order or independent of a physician as part of a nursing regimen, subject to the provisions of 8 NYCRR 29.1 (b) (9) as set forth in footnote 24 (supra), the treatment a registered professional nurse renders as part of a nursing regimen “shall be consistent with and shall not vary any existing medical regimen.” (Education Law § 6902 [1].) Thus, unlike psychologists and licensed clinical social workers, nurses are subject to limitations on their independent professional judgment when their professional judgment is contrary to an existing regimen prescribed or formulated by a physician.
Similarly, nurse practitioners may diagnose mental and physical illnesses and perform therapeutic and corrective measures within a specialty area of practice (1 of the 17 established nurse practitioner specialties is psychiatry) in collaboration with a licensed physician qualified to collaborate in the specialty involved provided that such services are performed in accordance with a written practice agreement and written practice protocols. The written practice agreement shall include explicit *195 provisions for the resolution of any disagreement between the collaborating physician and the nurse practitioner regarding a matter of diagnosis or treatment that is within the scope of practice of both. To the extent that the practice agreement does not so provide, then the collaborating physician’s diagnosis or treatment shall prevail. (See, Education Law § 6902 [3] [a].)[40] In addition to providing for resolution of disagreements between the nurse practitioner and his or her collaborating physician, the collaborative practice agreement must provide for review of a sample of patient records at least once every three months by the collaborating physician. (8 NYCRR 64.5 [b] [as clarified by the State Board for Nursing on the Department of Education’s Office of the Professions Web site].)[41]
*196 Thus, unlike psychologists and licensed clinical social workers, nurse practitioners may only practice in conjunction with a collaborating physician qualified to collaborate in the specialty involved. The collaborating physician has an obligation of oversight of the nurse practitioner’s practice which must be carried out through his or her periodic review, at least once every three months, of a portion of the patient charts of the nurse practitioner. Additionally, the collaborative practice agreement must contain a process for resolution of professional disputes between nurse practitioner and the collaborating physician and, to the extent the practice agreement does not so provide, then the collaborating physician’s diagnosis or treatment must prevail.
As noted above, it is axiomatic that proper diagnosis is a condition precedent for appropriate treatment planning which is required to assure appropriate and effective treatment. Proper diagnosis of mental, emotional, behavioral, addictive and developmental disorders and disabilities and of the psychosocial aspects of illness, injury, disability and impairment requires a comprehensive and holistic biopsychosocial approach through which the causes of the disorders, symptoms and dysfunctions can be identified and addressed. Had the Legislature believed that psychologists and licensed clinical social workers are not competent to make such diagnoses using a biopsychosocial approach and/or that permitting them to do so would negatively impact on public safety, it could have required physician consultation for psychologists and licensed clinical social workers in the case of patients or clients suffering from severe mental illness as it requires with regard to mental health practitioners licensed pursuant to Education Law article 163; it could have required that if a physician disagrees with the treatment being offered by a psychologist or licensed clinical social worker, that treatment would have to conform to the treatment plan prescribed or approved by the physician as it requires in relation to registered nurses; it could have required that psychologists and licensed clinical social workers practice under collaborative practice agreements with a psychiatrist, as it requires *197 for psychiatric nurse practitioners; it could have declined to permit diagnosis within the scope of practice of psychology and licensed clinical social work as it did in relation to the practice of licensed master social work and licensed mental health practitioners; or it could have limited the types of disorders which psychologists and licensed clinical social workers can diagnose and treat independently. That the Legislature did not impose any such restrictions speaks volumes that they did not choose to impose any such limitations and that psychologists and licensed clinical social workers may, within the scopes of practice in their respective licenses, diagnose mental, emotional, behavioral, addictive and developmental disorders and disabilities and the psychosocial aspects of illness, injury, disability and impairment using a comprehensive and holistic biopsychosocial approach in accordance with the standard of care shared in this regard by both professions.
Training and Competence of Psychologists and Licensed Clinical Social Workers
Defense counsel for R.R. argues that there is a wide difference in the education provided by different training programs in psychology and clinical social work and in the breadth of supervised experience obtained by psychologists and clinical social workers in training to the extent that not all members of these professions have the same level of competence in the performance of clinical work. He then argues that in establishing a scope of practice for a profession, the Legislature must look at the training, knowledge and skills of the profession as a whole, not merely a small subset of that group, and that psychologists and clinical social workers as a group, as opposed to a subset of those professions, are not competent to make or render diagnoses and prognoses, formulate treatment plans and treat mental disorders or mental, emotional and behavioral symptoms which, either in whole or in part, are or may reasonably be assumed to be organic in nature or which may result to some degree from a concurrent physical ailment or dysfunction.[42] *198 This concern, even if accurate, is not availing as a legal argument.
This court has obtained and reviewed the educational bulletins of various Master’s level social work programs and doctoral programs in clinical psychology from various schools in New York State. The educational programs in clinical psychology provide training in the psychology of human behavior (including human development and societal, cognitive, emotional and biological influences on behavior), psychopathology, neuro *199 psychology, counseling and psychotherapy, professional ethics, psychodiagnostic testing, cultural diversity, research and statistics, and various elective courses that address special treatment techniques, how to address the services needs of various clinical populations (e.g., children, geriatric patients, the chronically mentally ill, etc.), and other elective topics. These programs also require a period of supervised fieldwork in which students learn to apply in everyday clinical situations what they have learned in the classroom. There are courses and seminars related to preparing the students to complete the required dissertation for the Ph.D. degree.
The educational programs in social work generally tend to follow the same basic framework. In the first year (which may be completed over a lengthier period) students complete an integrated year long course that addresses all aspects of human development, functioning and behavior in a biopsychosocial context; a year of coursework in social work practice in general, the development of basic social work practice skills, and on dealing with ethical issues in practice; two semesters of coursework that address social policy, social welfare, social justice, service delivery systems and the history of social work; a course dealing with cultural and social diversity; and a course in research. In the second year there is more variability but all schools require a year of coursework in advanced social work practice in the student’s area of concentration, an additional research course (in most schools), a course in social work assessment and diagnosis or psychopathology, and various electives which address areas of practice, advanced training in specific skills (e.g., family therapy, crisis intervention, etc.), working in specific settings (e.g., criminal justice, health care, etc.) or with specific populations (e.g., children, the elderly, etc.), and other topics in social work. Each year, the students must complete two semesters of field placement where they learn to provide social work services under supervision in facility settings where they integrate what they are learning in the classroom into their beginning practice of social work in the field.
It is clear to this court that more needs to be done to prepare psychologists and clinical social workers to meet the evolving needs of the health and mental health systems and of the patient populations they will be called upon to serve. Yet, there is only so much that can be taught in the given time, and there is an ever increasing and changing body of knowledge that needs to *200 be learned and assimilated. Professional education is a lifelong endeavor and professionals have an obligation to pursue that education throughout their careers. This being said, it is clear to this court that social work and psychology programs need to increase their training in the biological aspects of human functioning, the development and treatment of psychopathology, and the impact of physical illnesses on psychosocial functioning. Additionally, all students should be required to take courses in working with chronically and terminally ill patients and their families, in working with children and adolescents, in working with the elderly, in working with patients who suffer from severe chronic mental illness, in working with substance abusers, in providing crisis and emergency intervention, and in family or group therapy. In most clinical psychology programs and Master’s degree programs in social work, most, if not all of these courses are available as electives, but there is not enough time to take them all. It may be that such a bold idea will increase the time it takes to complete the educational program, but it would appear to be indicated if the psychologists and clinical social workers of the future are to be prepared to address the breadth of clinical service needs in the health and mental health systems. Perhaps these electives can be taken while social workers are completing their three years of postMaster’s degree supervised experience needed to qualify for the licensed clinical social worker license, and the psychology students can complete them while they are completing their two years of internship training required for licensure.
It is of exceedingly serious concern to this court that social workers obtaining their post-Master’s degree supervised experience to become licensed clinical social workers and psychology students completing internship experiences needed for psychology licensure are permitted to obtain this supervised experience outside of facilities. In this court’s view, being able to work in a facility as part of an interdisciplinary team is a crucial part of professional education and development of all health and mental health professionals. Additionally, in this regard, this court has observed that over the years psychologists and licensed clinical social workers have increasingly not been obtaining experience in working with the wide range of patients, including the most seriously mentally ill patients, as part of their training, which experience can often only be obtained in facility-based practice. The lack of this experience limits their ability to provide appropriate quality evaluation, treatment planning and treatment *201 services to this significant vulnerable population and decreases the number of mental health professionals willing and able to care for this underserved and clinically challenging group of patients.
In enacting the new licenses for psychologists and clinical social workers with a broad scope of practice and without any requirement for supervision, consultation, referral or oversight by physicians or other disciplines, the Legislature recognized that these professionals, unlike those being licensed pursuant to article 163 of the Education Law, are not merely psychotherapists, and placed significant confidence and a substantial public trust in the professional knowledge, skills and competence of psychologists and clinical social workers and in their dedication to provide high quality, cutting edge, health and mental health services to the people of our state. While these licenses provide professional benefits to psychologists and clinical social workers, they also place a heavy burden on each of them, on their professional organizations and on the professional schools which train them to meet the significant challenges and responsibilities inherent in being granted these licenses which establish a broad scope of practice for them and provide them with a very significant degree of professional independence and discretion.
The responsibilities inherent in being granted these licenses require that psychologists and clinical social workers dedicate themselves to a lifetime of learning, devoting regularly the time necessary to keep up to date with the significant amounts of increasing biopsychosocial knowledge and the new skills that will constantly redefine the ever evolving practice of psychology and clinical social work in the health and mental health arena. The responsibilities inherent in psychology and clinical social work being granted these licenses also place a heavy burden on the professional organizations of psychologists and clinical social workers and on the schools which train them. These organizations will need to take steps to maintain high standards of practice, to hold their members accountable for keeping current with the knowledge and skills needed to engage in quality clinical practice and to remember always that they have a serious obligation as health and mental health providers to serve the public. The schools will need to increase significantly their educational efforts to assure that psychologists and clinical social workers are constantly prepared with the wide range of the most up-to-date biopsychosocial knowledge and innovative clinical skills. Only in this way will these professionals be able *202 to meet the significant and growing challenges of providing quality, cutting edge, health and mental health services based on the constantly developing biopsychosocial knowledge base and evolving set of clinical skills, to a highly diverse group of patients of all ages who have a wide variety of health, mental health and social problems and service needs. In granting these new licenses which place a significant public trust in the disciplines of psychology and clinical social work, the Legislature expected and the people of this state deserve nothing less.
This court has served on the bench for 35 years. During that time numerous mental health experts have appeared before this court. This court’s experience is that the quality of the professional services of these experts has depended far more on the professional involved and the thoroughness of his or her evaluation, rather than his or her discipline. Indeed, some of the most useful reports have been submitted by a clinical social worker.
Clinical social workers are uniquely suited to assist the courts as forensic experts because they have particular competence in assessing the impact of a person’s mental and physical condition on his or her social functioning, a key element in rendering forensic mental health assessments and opinions. Now that clinical social workers are specially recognized by licensure as having separate clinical skills in addition to the important skills of other Master’s level social workers, this court believes that serious consideration should be given to qualifying them by statute as psychiatric examiners along with psychiatrists and psychologists.
Although these issues are not of any legal import in this court’s determination of the issue at bar, this court shares R.R.’s defense counsel’s serious concerns in this regard and commends these comments to the Education Department for its consideration.
Conclusion
This court finds, as a matter of law, that the evaluation, making and rendering of diagnoses and prognoses, formulating treatment plans and the psychological-psychosocial treatment of mental disorders or of mental, emotional and behavioral symptoms which, either in whole or in part, are or may reasonably be assumed to be organic in nature or which may result to some degree from a concurrent physical ailment or dysfunction, are within the scope of practice of the professions of psychology and licensed clinical social work, whose scopes of practice although described using some different words at times, do not *203 vary in substance and are wholly equal and the same. Therefore, the application of defense counsel for defendant R.R. that Mr. Bodek be relieved, that Dr. Larino’s report be stricken and that a reexamination of R.R. by a qualified psychiatrist be ordered is denied.
The limitation that defense counsel for G.A. would impose on licensed clinical social workers and on psychologists as nonphysicians, that they may only consider the presence of physical or biological conditions once such a condition has been properly diagnosed by a physician, is rejected. This court finds, as a matter of law, that psychologists and licensed clinical social workers are required to gather information about the physical health of each of their patients as part of their initial patient assessments and on an ongoing basis throughout the time that they are treating their patients. They must consider and integrate this information into their ongoing diagnostic assessments and treatment planning which should include, when indicated, referral of a patient to another licensed health care provider for evaluation and treatment. In the presence of symptoms of physical illness, they need not wait for confirmation from a physician before considering and integrating that information into their diagnostic assessment and treatment planning, which is not static and may change as new information is received.[43]

. Hillel Bodek is a clinical social worker who is widely known and respected for his work in the area of forensic clinical social work and for his work with persons who suffer from neuropsychological/developmental disabilities and/or other chronic physical disorders and who suffer from concurrent mental disorders and other psychosocial problems. As the founding chairperson of the Committee on Forensic Clinical Social Work of the National Federation of Societies for Clinical Social Work, he was the principal author of the Standards for Forensic Clinical Social Work Practice promulgated by the National Federation and adopted by the New York State Society for Clinical Social Work. He has been elected to the Social Work Academy of the National Academies of Practice (a national organization, akin to the National Academy of Science which honors researchers, this group honors up to 150 clinicians in each of 10 health care disciplines as distinguished practitioners in their discipline and works to encourage interdisciplinary practice by health care professionals) as a distinguished practitioner of social work.

. Mr. Bodek examined defendant R.R., administered various psychodiagnostic tests to him, interviewed his family, reviewed the 730 reports and the records relating to the facial and head trauma he had previously sustained, *164 the injuries he sustained during the altercation in the instant case and the records of his mental health services, and conferred with his treating psychiatrist. He opined that although cognitively impaired, the defendant did not sustain significant brain damage in the mugging or thereafter, but that his slow responses were the result of a significant posttraumatic stress disorder and depression stemming from his original mugging which was exacerbated by his having been beaten in the course of the altercation in the instant case when he reportedly went to the aid of a friend who was involved in the altercation. A competency hearing was held. Based on Mr. Bodek’s testimony, the People met their burden of proving that the defendant was competent to proceed. He then proceeded to take a plea to a lesser included offense with a promise of probation and continued psychiatric treatment, which plea offer was based on the results of Mr. Bodek’s evaluation of him.

. Mr. Bodek examined defendant G.A., reviewed the records of his parole supervision and prior health and mental health care, and interviewed a number of witnesses in this case. He determined that at the time of the instant offense the defendant, who had no history of mental health problems prior to this case, was infected with HIV and that as a result of that untreated infection he had been developing dementia. Because of his high viral load at the time of the offense, he had been experiencing episodes of delirium superim *165 posed on the preexisting dementia as a result of which he was unable to appreciate the nature, consequence and wrongfulness of his conduct. Once he was diagnosed as HIV positive after his arrest and treated with anti-retroviral medications, his delirium subsided although he still manifested signs of mild dementia. A trial was held at which Mr. Bodek testified as an expert. Based on Mr. Bodek’s expert testimony, the defendant was found not responsible by reason of mental disease or defect.

. This court took such a step because in its view a court-appointed clinical expert must be held to a higher standard than a clinical expert retained by a party; and, in making such an appointment, a court must assure itself of the clinical and forensic training, experience, knowledge, skills, expertise and competence of such a clinical expert, must have no doubt as to whether the examination in question is properly within the scope of practice of the clinician’s professional license, and must assure itself that the clinician appointed is fully capable of providing an appropriate examination and evaluation that is of high quality.

. Defense counsel went on to note that
“[t]hese new licenses for psychologists and clinical social workers permit them to address the ‘psychological aspects of physical illness, accident, injury or disability,’ or to carry out, ‘diagnostic assessment of mental, emotional, behavioral, addictive and developmental disorders and disabilities and of the psychosocial aspects of illness, injury, disability and impairment undertaken within a psychosocial framework,’ respectively. It is patently obvious that in order for a mental health practitioner to address in an appropriate, informed and thorough manner the mental, *166 emotional and social aspects of a physical illness or infirmity, there must first be an accurate assessment of the nature, extent, causes, potential effects and likely prognosis of that physical illness or infirmity. Performance of that kind of assessment is squarely solely within the scope of the practice of medicine. Thus, the new psychology and clinical social work licensing statutes must clearly be viewed as proscribing the scope of the diagnostic and treatment practices and services of psychologists and clinical social workers in relation to the evaluation of treatment of the, ‘mental, emotional and social aspects of physical illness, injury, disability and impairment,’ to the extent that the prescription and ongoing supervision of such services by the patient’s treating physician is required. Physicians are the only professionals whose license permits them to make such assessments and to determine the appropriate treatment for the mental, emotional and social aspects of a physical illness or impairment in the context of the overall treatment plan established for the patient. To find otherwise, raises the possibility, indeed the likelihood, that a mental health professional can establish a different treatment plan directed toward the mental, emotional and social aspects of a physical ailment or infirmity, which will be at variance, and potentially in conflict, with the overall treatment plan prescribed by the treating physician. Therefore, it is my view that under the new statutes, to the extent that psychologists and clinical social workers provide services that are directed to a person’s physical health, they may only provide such services under the supervision and at the prescription of a physician, as part of the treatment plan developed and supervised by that physician, who has the ultimate responsibility for the person’s overall evaluation and treatment.”

. In doing so, defense counsel noted,
“I cannot in good faith question the competence of Mr. Bodek ... He is well-known and well-respected as a clinical social worker who specializes in working with developmentally disabled and neurologically impaired persons who may or may not have concurrent mental and emotional problems. His reputation is that he conducts thorough assessments and provides comprehensive reports that outline his opinion and the basis for his opinion. He has been accepted as an expert in federal and state courts in cases such as this case, where brain damage and its effects are a primary issue.”

. In this regard, defense counsel went on to assert that
“[t]o the extent that one may argue that Dr. Larino is authorized pursuant to CPL § 730.20 to be designated to examine [the defendant] with regard to his competence to proceed, and may, therefore, make a diagnosis of dementia, such an argument is fundamentally flawed ... It does not matter whether the diagnosis or prognosis is made for clinical reasons or for forensic reasons. Thus, even when conducing an assessment and making a diagnosis or prognosis for forensic purposes, a psychologist or clinical social worker may not exceed the scope of his or her statutory scope of practice, as I believe Dr. Larino has done here” (citations omitted).

. Courts are required to give great deference to regulatory agencies in the interpretation of the statutes they are charged with implementing. Thus, this court took great pains to avoid intruding into the regulatory process of the Education Department which, in the first instance, is charged with issuing regulations that clarify and implement professional licensing statutes and to avoid, to the extent possible, a judicial decision which would be contrary with a promulgated regulation. Additionally, once Mr. Bodek’s reports were available, this ruling would be able to more clearly address the issues involved based on the services actually provided and the diagnoses actually made by him, and to also address the report and opinion of Dr. Larino, the psychologist at the Court Clinic who also evaluated defendant R.R.

. Under these statutes, a bartender, taxicab driver, barber, hairdresser or tarot card reader could legally practice psychology or certified social work and provide counseling and psychotherapy as long as he or she did not hold himself or herself out as a psychologist or certified social worker or describe his or her services as being psychological in nature. By merely limiting the use of certain professional titles while failing to limit the practice of the professions and the rendering of the professional services themselves, these statutes appear to have violated the First Amendment right against government intrusion into the freedom of commercial speech. (See, Abramson v Gonzalez, 949 F2d 1567, 1575-1578 [11th Cir 1992].) In this regard, 45 years have passed since our Court of Appeals held the original article 153 of the Education Law to be constitutional, notwithstanding the fact that it was a certification rather than a licensing statute, finding that, “ ‘if the act is a step in the direction of something which will enure to the public health and comfort, that it does not go as far as it might, is not a reason for invalidating it.’ ” (National Psychological Assn. for Psychoanalysis v University of State of N.Y., 8 NY2d 197, 202-203 [I960].)

. This statute was subsequently repealed and replaced by Laws of 1971 (ch 987, § 1). The changes made to the original statute are not related or relevant to and do not impact on the instant issue.

. Psychologists are licensed pursuant to article 153 of the Education Law. Until September 2003, that statute did not define psychology. Psychology was defined by 8 NYCRR former 72.6 (a), which provided that,
“[t]he practice of psychology includes rendering to individuals, organizations, or the public, any service involving the application of principles, methods or procedures or understanding, predicting or influencing behavior, such as the principles pertaining to learning, perception, motivation, thinking, emotions, or interper *170 sonal relationships, or the methods or procedures for interviewing, counseling or psychotherapy; or of constructing, administering or interpreting tests of mental abilities, aptitudes, interests, attitudes, personality characteristics, emotions or motivations; or of assessing public opinion. The application of said principles and methods includes but is not restricted to: the psychological evaluation, prevention, diagnosis and amelioration of personality and behavior disorders and adjustment problems of individuals and groups; educational and vocational planning; personnel selection and management; the arrangement of effective work and learning situations; advertising and market research; the resolution of interpersonal and social conflicts; lecturing on or teaching of psychology; and the design and conduct of applied psychological research.”

. This statute was subsequently repealed and replaced by the Laws of 1971 (ch 987, § 1). The changes made to the original statute are not related or relevant to and do not impact on the instant issue.

. Social workers are licensed pursuant to article 154 of the Education Law. The statute that was in existence at the time Mr. Bodek was appointed in these cases which was replaced by the new licensing statute on September 1, 2004 defined the practice of certified social work as
“engaging, under such title, in social casework, social group work, community organization, administration of a social work program, social work education, social work research, or any combination of these in accordance with social work principles and methods. The practice of social work is for the purpose of helping individuals, families, groups and communities to prevent or to resolve problems caused by social or emotional stress” (Education Law former § 7701 [emphasis supplied]).

. The statute, Education Law § 7601-a, defines the scope of practice of psychology as
“1. . . . the observation, description, evaluation, interpretation, and modification of behavior for the purpose of preventing or eliminating symptomatic, maladaptive or undesired behavior; enhancing interpersonal relationships, personal, group or organizational effectiveness and work and/or life adjustment; and improving behavioral health and/or mental health. The practice includes, but is not limited to psychological (including neuropsychological) testing and counseling; psychoanalysis; psychotherapy; *171 the diagnosis and treatment of mental, nervous, emotional, cognitive or behavioral disorders, disabilities, ailments or illnesses, alcoholism, substance abuse, disorders of habit or conduct, the psychological aspects of physical illness, accident, injury or disability, psychological aspects of learning (including learning disorders); and the use of accepted classification systems.
“2. The term ‘diagnosis and treatment’ means the appropriate psychological diagnosis and the ordering or providing of treatment according to need. Treatment includes, but is not limited to counseling, psychotherapy, marital or family therapy, psychoanalysis, and other psychological interventions, including verbal, behavioral, or other appropriate means as defined in regulations promulgated by the commissioner.”

. The Web site of the American Psychological Association lists 54 divisions, each of which addresses a different area of psychology practice. Of these 54 divisions, only 12 appear to relate to direct clinical practice, to wit: addictions, clinical child and adolescent psychology, clinical neuropsychology, clinical psychology, counseling psychology, group psychology and group psychotherapy, health psychology, pediatric psychology, psychoanalysis, psychological hypnosis, psychotherapy, and rehabilitation psychology. Most of the other divisions address various research, policy and practice setting related interests in the larger discipline of psychology. It appears from a review of the new statute and of part 72 of the Commissioner’s regulations (8 NYCRR part 72), that those psychologists who specialize in nonclinical meas will no longer be able to become licensed in this state. However, those who teach psychology, even if they do not specialize in a clinical area, will be exempt from these requirements in terms of their academic functions. (See, Education Law § 7605 [1].) However, researchers and other psychologists who do not specialize in clinical areas and, thus, will no longer be able to be licensed, will also be unable to refer to themselves as psychologists.

. The statute, Education Law § 7701, defines the scope of practice of licensed master social work as
“1. . . . (a) . . . the professional application of social work theory, principles, and the methods to prevent, assess, evaluate, formulate and implement a plan of action based on client needs and strengths, and intervene to address mental, social, emotional, behavioral, developmental, and addictive disorders, conditions and disabilities, and of the psychosocial aspects of illness and injury experienced by individuals, couples, families, groups, communities, organizations, and society.
“(b) Licensed master social workers engage in the administration of tests and measures of psychosocial functioning, social work advocacy, case management, counseling, consultation, research, administration and management, and teaching. *172 “(c) Licensed master social workers provide all forms of supervision other than supervision of the practice of licensed clinical social work as defined in subdivision two of this section.
“(d) Licensed master social workers practice licensed clinical social work in facility settings under supervision in accordance with the commissioner’s regulations.”
A chapter amendment passed after the original statute was enacted made a minor, nonsubstantive change to the definition of licensed master social work. (L 2004, ch 230, § 7.) It reworded paragraph (d) of subdivision (1) of section 7701 by adding the phrase, “or other supervised settings approved by the department," after the phrase “in facility settings." (Id. [emphasis added].)

. The statute, Education Law § 7701, defines the scope of practice of licensed clinical social work as
“2. . . . (a) . . . the scope of practice of clinical social work encompasses the scope of practice of licensed master social work and, in addition, includes the diagnostic assessment of mental, emotional, behavioral, addictive and developmental disorders and disabilities and of the psychosocial aspects of illness, injury, disability and impairment undertaken within a psychosocial framework; administration and interpretation of tests and measures of psychosocial functioning; development and implementation of appropriate assessment-based treatment plans; and the provision of crisis oriented psychotherapy and brief, short-term and long-term psychotherapy and psychotherapeutic treatment to individuals, couples, families and groups, habilitation, psychoanalysis and behavior therapy; all undertaken for the purpose of preventing, assessing, treating, ameliorating and resolving psychosocial dysfunction with the goal of maintaining and enhancing the psychological and social functioning and well-being of individuals, couples, families, small groups, organizations, communities and society.”
The statute then proceeds to define the terms diagnosis, psychotherapy and assessment-based treatment plans as
“(b) Diagnosis. Diagnosis in the context of licensed clinical social work practice is the process of distinguishing, beyond general social work assessment, between similar mental, emotional, behavioral, developmental and addictive disorders, impairments and disabilities within a psychosocial framework on the basis of their similar and unique characteristics consistent with accepted classification systems.
“(c) Psychotherapy. Psychotherapy is the use of verbal methods in interpersonal relationships with the intent of assisting a person or persons to modify attitudes and behavior which are intellectually, socially, or emotionally maladaptive.
“(d) Assessment-based treatment plans. Development of assessment-based treatment plans in the context of clinical social work practice refers to the development of an integrated plan of prioritized interventions, that is based on the diagnosis and psychosocial assessment of the client, to address mental, emotional, behavioral, developmental and addictive disorders, impairments *173 and disabilities, reactions to illnesses, injuries, disabilities and impairments, and social problems.”
A chapter amendment passed after the original statute was enacted made three minor, nonsubstantive changes to the definition of clinical social work. (L 2004, ch 230, § 7.) First, it removed the words scope of from the phrase “the scope of practice of clinical social work” (id. [emphasis added]). Second, it changed the phrase diagnostic assessment to diagnosis. Third, it changed the phrase “maintaining and enhancing the psychological and social functioning and well-being of’ to read “maintaining and enhancing the mental, emotional, behavioral and social functioning and well-being of’ (id. [emphasis added]), removing the word psychological and replacing it with the phrase mental, emotional, behavioral, no doubt so as not to offend psychologists by the use of the term psychological.
This chapter amendment also made five minor, nonsubstantive changes to the definitions of diagnosis, psychotherapy and assessment-based treatment plans. It removed those three leading phrases that preceded each of these definitions, respectively. It added the phrase “in the context of licensed clinical social work practice” (id. [emphasis added]) after the word psychotherapy in the definition of psychotherapy and it added the word licensed before the phrase clinical social work in the definition of assessment-based treatment plans.

. Psychosocial assessment is an assessment of the environmental elements and psychological attributes of an individual which play a contributory role in the onset, course and treatment of a disorder or social problem. This is distinguished from a diagnostic assessment which, in addition to gathering psychosocial and other information, includes conducting a mental status examination (an examination that assesses the level of psychosocial, neuropsychiatric and behavioral functioning of a person, in the process reviewing the various elements that make up a person’s mental, emotional and behavioral functioning, and personality characteristics) and potentially obtaining psychodiagnostic and other testing, all of which information is then analyzed to determine which of two or more disorders with similar symptoms the patient suffers from (so-called differential diagnosis). (Adapted from Robert J. Campbell, Psychiatric Dictionary [8th ed 2004]; Jane E. Edgerton and Robert J. Campbell [editors], American Psychiatric Glossary [7th ed 1994].)

. A service plan is a plan of action to address psychosocial problems which is based on a psychosocial evaluation including an assessment of client strengths and weaknesses, identification and evaluation of presenting problems and their seriousness, and identification of resources available to address these problems. A service plan may include provisions for arranging for health and/or mental health evaluation and treatment services. Those clinical services would be carried out in accordance with an assessment-based treatment plan developed and based on a differential diagnosis and psychosocial assessment of the patient. The treatment plan sets forth an integrated plan of prioritized interventions, provided by clinical social workers and/or other health and mental health care providers, that are needed to evaluate clinically and to treat the patient’s mental, emotional, behavioral, developmental and addictive disorders, impairments and disabilities, reactions to illnesses, injuries, disabilities and impairments and to address the social sequelae of those disorders, injuries, disabilities and impairments. While a service plan may include provisions for arranging for clinical evaluation and treatment, the specific nature and extent of such clinical evaluation and treatment would be established by and set forth in the treatment plan, the formulation of which is outside the scope of practice of licensed master social work.

. Counseling is not defined in the statute. The various definitions of counseling which this court has reviewed have generally contained the same elements. Counseling is a process of supporting, educating, guiding, advising and encouraging a person to help him or her (or a couple, family or group) recognize, understand, solve, cope with and adjust to problems and problem situations. Although psychotherapy includes the elements of counseling, unlike counseling which is geared to facilitating adjustment, psychotherapy is a modality of treatment geared toward modifying and/or ameliorating mental, emotional and behavioral symptoms, dysfunction, disorders and illnesses. Thus, while licensed master social workers may provide counseling to facilitate the adjustment to a disorder, illness, impairment, disability, injury, or social problem, licensed clinical social workers may, in addition, treat those disorders, illnesses, impairments and disabilities and the psychosocial sequelae of illnesses, injuries, disabilities and impairments, and social problems.

. The 12 functions mentioned in Education Law § 7702 (1) (a) through (Z) and how they relate to functions set forth in Education Law § 7701 (1) (a) through (c) are as follows:
“(a) Serve as a community organizer, planner, or administrator for social service programs in any setting [covered by engaging in administration and management, provide consultation and engage in social work advocacy].
“(b) Provide supervision and/or consultation to individuals, groups, institutions and agencies [covered by provide supervision other than of the practice of clinical social work, and provide consultation],
“(c) Serve as a faculty member or instructor in an educational setting [covered by teaching],
“(d) Plan and/or conduct research projects and program evaluation studies [covered by perform research and engaging in administration and management],
“(e) Maintain familiarity with both professional and self-help systems in the community in order to assist the client in those services when necessary [the word obtaining or accessing after the phrase ‘assist the client in,’ appears to be missing in this item, which it appears should read, assist the client in obtaining/ accessing those services] [covered by provide case management, formulate and implement service plans, and engage in social work advocacy],
“(f) Assist individuals or groups with difficult day to day problems such as finding employment, locating sources of assistance, and organizing community groups to work on a specific problem [covered by provide case management and formulate and implement service plans],
“(g) Consult with other agencies on problems and cases served in common and coordinating services among agencies or providing case management [covered by provide case management, formulate and implement service plans, provide consultation, and engaging in administration and management],
“(h) Conduct data gathering on social problems [covered by perform research],
“(i) Serve as an advocate for those clients or groups of clients whose needs are not being met by available programs or by a specific agency [covered by engage in social work advocacy],
“(j) Assess, evaluate and formulate a plan of action based on client need [covered by assess and evaluate psychosocial functioning and formulate and implement service plans],
“(k) Provide training to community groups, agencies, and other professionals [covered by teaching and provide consultation],
“(Z) Provide administrative supervision [covered by provide supervision and engaging in administration and management].”

. Education Law § 7701 (1) lists the following functions of licensed master social work: (i) assess and evaluate psychosocial functioning, (ii) formulate and implement service plans to prevent and address mental, social, emotional, behavioral, developmental and addictive disorders, conditions and disabilities, and the psychosocial aspects of illness and injury, (iii) administer tests and measures of psychosocial functioning, (iv) engage in social work advocacy, (v) provide case management, (vi) provide counseling, (vii) provide consultation, (viii) perform research, (ix) engage in administration and management, (x) teach, and (xi) provide supervision other than of the practice of clinical social work.

. The National Association of Social Workers’ Web site contains the following definition of case management:
*177 “Social work case management is a method of providing services whereby a professional social worker assesses the needs of the client and the client’s family, when appropriate. [The case manager] arranges, coordinates, monitors, evaluates, and advocates for a package of multiple services to meet the specific client’s complex needs. A professional social worker is the primary provider of social work case management. Distinct from other forms of case management, social work case management addresses both the individual client’s biopsychosocial status as well as the state of the social system in which case management operates. Social work case management is both micro and macro in nature: intervention occurs at both the client and system levels. It requires the social worker to develop and maintain a therapeutic relationship with the client, which may include linking the client with systems that provide him or her with needed services, resources, and opportunities. Services provided under the rubric of social work case management practice may be located in a single agency or may be spread across numerous agencies or organizations” (<http://www.socialworkers.org/practice/ standards/sw_case_mgmt.asp#def>, cached at <http://www.courts. state.ny.us/reporter/webdocs/nasw_standards_socialwork_casemgt.htm>; emphasis supplied).

. In this regard, 8 NYCRR 29.1 (b) (9) defines unprofessional conduct as including
“practicing or offering to practice beyond the scope permitted by law, or accepting and performing professional responsibilities which the licensee knows or has reason to know that he or she is not competent to perform, or performing without adequate supervision professional services which the licensee is authorized to perform only under the supervision of a licensed professional, except in an emergency situation where a person’s life or health is in danger.”

. Supervision in this context is a legal term. In relation to supervision of a licensed master social worker or a student, extern or intern in a mental health discipline who is providing clinical services under supervision, it means that the patients or clients being served by the supervisee are considered patients or clients of the supervisor, not of the supervisee, that the supervisor is personally professionally responsible and accountable for the evaluation, care and treatment of these patients or clients, that the supervisee is acting under the umbrella of the supervisor’s license, and that the supervisor is personally professionally responsible, accountable and liable under the doctrine of respondeat superior for the professional conduct, misconduct, malpractice and actions of or the failures to act by the supervisee in relation to the patients or clients with regard to whose evaluation, care and treatment he or she is the supervisor.

. Psychological may be defined as pertaining to mental, emotional and behavioral processes and functioning. Psychosocial may be defined as the environmental elements and psychological attributes of an individual which play a contributory role in the onset, course and treatment of a disorder or social problem. (See, n 18, supra.)

. The biopsychosocial model
“is a perspective or conceptualization of disease emphasizing that all diseases have biological, psychological and social components. George Engel is usually credited with introducing the concept, derived from his work in psychosomatic medicine [‘an interdisciplinary approach to illness that emphasizes the interactions of medical, psychological and social factors in the predisposition to, and the development and severity of, organic illnesses and their response to treatment’].” (Robert J. Campbell, Psychiatric Dictionary [8th ed 2004].)
Two of George Engel’s articles, written over his 50-year career at the University of Rochester School of Medicine, which address the need for the use of a biopsychosocial model in diagnosing physical and mental disorders are G.L. Engel, The need for a new medical model: A challenge for biomedicine (196 Science 129-136 [1977]) and G.L. Engel, The clinical application of the biopsychosocial model (137 Am J Psychiatry 535-544 [1980]). (See, generally, A. Scott Dowling, Images in Psychiatry: George Engel, M.D. [1913-1999], 162 Am J Psychiatry 2039 [2005].)

. In People v Gans (119 Misc 2d 843 [Sup Ct, NY County 1983]), the first reported case in this state which addresses diagnosis of mental illnesses by clinical social workers using the DSM III, the court wrote:
“The Diagnostic and Statistical Manual of Mental Disorders— third edition (DSM III) represents the current guide for the diagnosis of mental disorders in the United States. The diagnostic criteria set forth in the DSM III were validated during field trials. These field trials were carried out by professionals from the disciplines of psychiatry, psychology, clinical social work and psychiatric nursing. Besides psychiatrists, psychologists and clinical social workers served on several of the advisory committees which developed this diagnostic guide and served as consultants to the task force which compiled it. This court is informed that a social worker, Janet Williams, M.S.W, served as coprincipal investigator and project co-ordinator for the reliability study and field trials of the DSM III. Further, throughout the DSM III references are made to its utilization by ‘clinicians,’ not exclusively by psychiatrists. It is clear, that if one is to accept the DSM III as a valid and reliable guide, then one must accept that properly trained psychiatrists, psychologists, clinical social workers and psychiatric nurses are qualified to apply its diagnostic criteria in their diagnostic assessment of patients. I find no merit in any *183 arguments that the application and use of the DSM III diagnoses should be limited to physicians and psychiatrists.
“This court holds that even though they are not physicians, certified social workers who demonstrate appropriate training and supervised clinical experience in the diagnostic assessment of mental disorders may, within the scope of their license, make diagnostic assessments of a person’s mental condition and may qualify as experts in the diagnosis of mental disorders.” (Gores, supra, 119 Misc 2d at 844-845.)

. In formulating such treatment plans following the biopsychosocial model which is interdisciplinary in nature because of its comprehensive and holistic framework, licensed clinical social workers and psychologists would provide, when indicated, for referral of patients to other health care providers for further specialized evaluation to clarify diagnosis and treatment needs, and/or for treatment that is outside of their scope of practice or, which although within their scope of practice is beyond their professional competence, consistent with patient needs. Clinical social workers, in particular, who have worked closely with physicians since the beginning of professional social work in New York City in the early 1900s, utilizing their clinical knowledge and skills, their skills as case managers, their extensive knowledge of the health, social and human service systems and how those systems function, and their ability to negotiate multiple systems, have historically proven to be masters of this difficult art who are highly skilled and effective in bringing together and coordinating professionals from different disciplines and specialties and a range of services to provide a comprehensive and holistic approach to patient care by a collaborating interdisciplinary team. (See generally, People v Scala, 128 Misc 2d 831, 842 n 14 [Sup Ct, NY County 1985].)

. The American Board of Examiners in Clinical Social Work is a specialty certification board which certifies competence of social workers in the specialty of clinical social work. It is akin to medical specialty boards which offer certification to physicians in various medical specialties and to the American Board of Professional Psychology which certifies psychologists in various specialties of psychology

. The American Board of Examiners in Clinical Social Work’s definition of clinical social work promulgated at its inception in 1987 provides:
“Clinical social work practice is the professional application of social work theory and methods to the diagnosis, treatment and prevention of bio-psycho-social dysfunction, disability or impairment, including emotional and mental disorders and developmental disabilities. Clinical social work practice is based on knowledge and theory of biological, psychological and social development, normal human behavior, psychopathology, the causes and effects of physical illness and disability, unconscious motivation, interpersonal relationships, family dynamics, environmental stress, social systems and cultural diversity with particular attention to the person existing as a combination of biological, psychological and social elements in his environment. “Clinical social work practice shares with all social work practice the goal of enhancement and maintenance of physical, psychological and social functioning of individuals, families and small groups. It encompasses bio-psycho-social diagnosis-, development and implementation of an appropriate assessment-based treatment plan; and documentation and review of treatment outcomes. “Clinical social work methods include, but are not limited to treatment of individuals, couples, families and groups. Intervention approaches may include, but are not limited to, brief and long-term psychotherapy, crisis intervention, client-centered advocacy and consultation about clinical social work practice. The process of clinical social work is undertaken with the objectives of social work and the principles and values contained in the codes of ethics of professional social work organizations” (emphasis supplied).

. The American Board of Professional Psychology’s definition of the practice of clinical psychology provides:
“Clinical psychology is both a general practice and a health service provider specialty in professional psychology. Clinical psychologists provide professional services relating to the diagnosis, assessment, evaluation, treatment and prevention of psychological, emotional, psychophysiological and behavioral disorders in individuals across the lifespan. These services include procedures for understanding, predicting, and alleviating intellectual, emotional, physical, psychological, social and behavioral maladjustment, and mental illness, as well as other forms of discomfort. In addition, it includes services for the enhancement of functioning in all of these areas.
“The services provided by clinical psychologists typically include: diagnosis and assessment; intervention, prevention, and treatment; consultation with healthcare professionals and others; program development, supervision, and administration; psychological services, including evaluation and planning of these services; and teaching and research including contributions to knowledge in each of these areas.
“It is expected that clinical psychologists will demonstrate sensitivity to and skills in dealing with multicultural/diverse populations. In this manual, we will use the terms multicultural and diversity interchangeably. Multiculturalism recognizes the broad scope of such factors as race, ethnicity, language, sexual orientation, gender, age, disability, class status, education, religion/spiritual orientation, and other cultural dimensions” (emphasis supplied).

. “The practice of the profession of mental health counseling is defined as:
“(a) the evaluation, assessment, amelioration, treatment, modification, or adjustment to a disability, problem, or disorder of behavior, character, development, emotion, personality or relationships by the use of verbal or behavioral methods with individuals, couples, families or groups in private practice, group, or organized settings; and
“(b) the use of assessment instruments and mental health counseling and psychotherapy to identify, evaluate and treat dysfunctions and disorders for purposes of providing appropriate mental health counseling services.” (Education Law § 8402 [1].)

. “The practice of the profession of marriage and family therapy is defined as:
“(a) the assessment and treatment of nervous and mental disorders, whether affective, cognitive or behavioral, which results in dysfunctional interpersonal family relationships including, but not limited to familial relationships, marital/eouple relationships, parent-child relationships, pre-marital and other personal relationships;
“(b) the use of mental health counseling, psychotherapy and therapeutic techniques to evaluate and treat marital, relational, and family systems, and individuals in relationship to these systems;
“(c) the use of mental health counseling and psychotherapeutic techniques to treat mental, emotional and behavioral disorders and ailments within the context of marital, relational and family systems to prevent and ameliorate dysfunction; and “(d) the use of assessment instruments and mental health counseling and psychotherapy to identify and evaluate dysfunc *189 tions and disorders for purposes of providing appropriate marriage and family therapy services.” (Education Law § 8403 [1].)

. “The practice of the profession of creative arts therapy is defined as:
“(a) the assessment, evaluation, and the therapeutic intervention and treatment, which may be either primary, parallel or adjunctive, of mental, emotional, developmental and behavioral disorders through the use of the arts as approved by the department; and
“(b) the use of assessment instruments and mental health counseling and psychotherapy to identify, evaluate and treat dysfunctions and disorders for purposes of providing appropriate creative arts therapy services.” (Education Law § 8404 [1].)

. “The practice of the profession of psychoanalysis is defined as: “(a) the observation, description, evaluation, and interpretation of dynamic unconscious mental processes that contribute to the formation of personality and behavior in order to identify and resolve unconscious psychic problems which affect interpersonal relationships and emotional development, to facilitate changes in personality and behavior through the use of verbal and nonverbal cognitive and emotional communication, and to develop adaptive functioning; and
“(b) the use of assessment instruments and mental health counseling and psychotherapy to identify, evaluate and treat dysfunctions and disorders for purposes of providing appropriate psychoanalytic services.” (Education Law § 8405 [1].)

. In making the determination that licensed master social workers may not make or render diagnoses and prognoses (which of necessity flow from and are intimately related to diagnoses) except when doing so under the supervision of a psychiatrist, psychologist or licensed clinical social worker and that licensed mental health practitioners may not make or render diagnoses and prognoses under any circumstances because the making or rendering of diagnoses and prognoses are not within their scopes of practice, this court has addressed a potential conflict of laws.
The potential conflict arises because Education Law § 8411 (3) provides that “[a]ny person licensed pursuant to [article 163] may use accepted classifications of signs, symptoms, dysfunctions and disorders, as approved in accordance with regulations promulgated by the department, in the practice of such licensed profession”; and Education Law § 7707 (5) provides that “[lficensed master social workers . . . may use accepted classifications of signs, symptoms, dysfunctions and disorders, including, but not limited to, classifications used in the practice setting for the purpose of providing mental health services.”
As noted previously, in addressing a potential conflict between two provisions of law, a court has the obligation to attempt to resolve the conflict to the extent possible in a manner that resolves the conflict and leaves the provisions intact. The DSM is the accepted classification of mental disorders currently in use. It contains lists of diagnoses of disorders with corresponding explanations of the signs, symptoms and dysfunctions related to each diagnostic entity and disorder. The International Classification of Diseases (ICD) is another diagnostic classification system that is currently in use. It lists diagnoses for all physical and mental diseases and disorders and descriptions of those diagnostic classifications.
This court finds, as a matter of law, that the provisions which allow licensed mental health practitioners to “use accepted classifications of signs, symptoms, dysfunctions and disorders, as approved in accordance with regulations promulgated by the department, in the practice of such licensed profession” (Education Law § 8411 [3]), and which permit licensed master social workers to “use accepted classifications of signs, symptoms, dysfunctions and disorders, including, but not limited to, classifications used in the practice setting for the purpose of providing mental health services” (Education Law § 7707 [5]), do not confer any diagnostic or prognostic privilege to licensed master social workers or to licensed mental health practitioners licensed pursuant to article 163 of the Education Law.
This court further finds, as a matter of law, that a licensed master social worker or licensed mental health practitioner may use the classifications of the signs and symptoms that they observe or otherwise discover that a patient or client is exhibiting, which are indicators of disorders and dysfunctions. However, they may only use, record and communicate diagnoses or classifications of disorders or dysfunctions set forth in the DSM, ICD or other classification systems in their reports, clinical record keeping, billing, communications, etc., after the diagnosis or classification of the disorder or dysfunction is *191 made by a health or mental health professional acting within the scope of practice of his or her discipline or, in the case of a licensed master social worker, also when he or she makes or renders a diagnosis or classification of a disorder or dysfunction when practicing under the supervision of a psychiatrist, psychologist or licensed clinical social worker. When a licensed master social worker or licensed mental health practitioner uses, records or communicates in writing a diagnosis or classification of a disorder or dysfunction, he or she must clearly note on the document in question adjacent to the recorded or communicated diagnosis or classification the name and discipline of the licensed practitioner who made the diagnosis or classification within the scope of practice of his or her discipline, or in the case of a licensed master social worker who makes or renders a diagnosis or classification of a disorder or dysfunction while practicing under the supervision of a psychiatrist, psychologist or licensed clinical social worker, the name and discipline of the supervisor who approved the diagnosis or classification. When the diagnosis or classification of a disorder or dysfunction is communicated orally, the licensed master social worker or licensed mental health practitioner must also communicate along with the diagnosis or classification, at the same time, the name and discipline of the person making the diagnosis or classification within the scope of practice of his or her discipline, or in the case of a licensed master social worker who makes or renders a diagnosis or classification of a disorder or dysfunction while practicing under the supervision of a psychiatrist, psychologist or licensed clinical social worker, the name and discipline of the supervisor who approved the diagnosis or classification.
Therefore, this court determines that based on the above analysis and findings, no conflict of laws exists in this regard.

. Education Law § 8407 (1) provides that
“[fit shall be deemed practicing outside the boundaries of his or her professional competence for a person licensed pursuant to [article 163 of the Education Law], in the case of treatment of any serious mental illness, to provide any mental health service for such illness on a continuous and sustained basis without a medical evaluation of the illness by, and consultation with, a physician regarding such illness. Such medical evaluation and consultation shall be to determine and advise whether any medical care is indicated for such illness. For purposes of this section, ‘serious mental illness’ means schizophrenia, schizoaffective disorder, bipolar disorder, major depressive disorder, panic disorder, obsessive-compulsive disorder, attention-deficit hyperactivity disorder and autism.”

. Education Law § 6901 provides, in pertinent part:
“As used in section sixty-nine hundred two:
“1. ‘Diagnosing’ in the context of nursing practice means that identification of and discrimination between physical and psychosocial signs and symptoms essential to effective execution and management of the nursing regimen. Such diagnostic privilege is distinct from a medical diagnosis.
“2. ‘Treating’ means selection and performance of those therapeutic measures essential to the effective execution and management of the nursing regimen, and execution of any prescribed medical regimen.
“3. ‘Human Responses’ means those signs, symptoms and processes which denote the individual’s interaction with an actual or potential health problem.”
Education Law § 6902 provides, in pertinent part:
“Definition of practice of nursing
“1. The practice of the profession of nursing as a registered professional nurse is defined as diagnosing and treating human responses to actual or potential health problems through such services as casefinding, health teaching, health counseling, and provision of care supportive to or restorative of life and well-being, and executing medical regimens prescribed by a licensed physician, dentist or other licensed health care provider legally authorized under this title and in accordance with the commissioner’s regulations. A nursing regimen shall be consistent with and shall not vary any existing medical regimen.”

. Education Law § 6902 (3) (a) provides:
“The practice of registered professional nursing by a nurse practitioner, certified under section six thousand nine hundred ten of this article, may include the diagnosis of illness and physical conditions and the performance of therapeutic and corrective measures within a specialty area of practice, in collaboration with a licensed physician qualified to collaborate in the specialty involved, provided such services are performed in accordance with a written practice agreement and written practice protocols. The written practice agreement shall include explicit provisions for the resolution of any disagreement between the collaborating physician and the nurse practitioner regarding a matter of diagnosis or treatment that is within the scope of practice of both. To the extent the practice agreement does not so provide, then the collaborating physician’s diagnosis or treatment shall prevail.”

. 8 NYCRR 64.5 (b) provides that
“ [practice agreements shall include provisions for referral and consultation, coverage for emergency absences of either the nurse practitioner or collaborating physician, resolution of disagreements between the nurse practitioner and collaborating physician regarding matters of diagnosis and treatment, and the review of patient records at least every three months by the collaborating physician; and may include such other provisions as determined by the nurse practitioner and collaborating physician to be appropriate.”
The clarification from the State Board for Nursing posted on the New York State Education Department’s Office of the Professions Web site states, in pertinent part:
“The law does not provide specific ratios or numbers of charts that must be reviewed by the collaborating physician. That decision is left to the professional judgment of the nurse practitioner and the collaborating physician and might vary depending on the: nurse practitioner’s experience, collaborating physician’s knowledge of the nurse practitioner’s abilities and judgment, specialty, patient mix, nature of the practice setting, and, other factors.
*196 “It is important that the nurse practitioner and the physician determine the terms of the collaboration on the matter of patient records review through negotiation and agreement. The appropriateness of the process of patient record review might be considered in professional discipline, malpractice litigation, or in institutional internal reviews, as for example in an Article 28 facility.” (<http://www.op.nysed.gov/nurserecordsreview.htm>, cached at <http://www.courts.state.ny.us/reporter/webdocs/ nys_nursing_practitioner_issues_patient_records_review.htm>.)

. In this regard, defense counsel wrote:
“[N]owhere is there a standard that I could find which assures that psychologists and clinical social workers, without regard to where they receive their training, will have a uniform specified amount of training and supervised clinical experience in the evaluation and treatment of persons who suffer from mental disorders which are either organic in nature or result to some degree from a concurrent physical ailment or in the integration *198 of knowledge of physical ailments to an extent that they can develop, independently of a supervising physician, an appropriate and integrated plan of treatment to address the mental, emotional and social aspects of physical illnesses or impairments from which persons they may be called upon to assess and treat may suffer.
“In establishing a scope of practice for a profession, the legislature must look at the training, knowledge and skills of the profession as a whole, not merely a small subset of that group. In medicine, there are relatively consistent broad core requirements for medical school and residency training programs, in terms of knowledge and direct patient care experience. To the contrary, in psychology and social work there is far more variation between training programs. This wide variation is both in the scope and nature of the coursework and in the scope, breadth of types of patients and their conditions, and settings where the students obtain their practical experience. Although some psychologists and clinical social workers may have broad experience and training in the diagnosis and treatment of persons who suffer from a wide range of mental disorders whom have concurrent medical problems, most do not. For instance, in social work, a person who has obtained a BA degree in social work, may enter a two year graduate program in social work at the second year level, using their BA training as satisfying the requirement for the first year of graduate training. The training in performance of psychodiagnostic testing varies between graduate psychology training programs and students from one program may be far more proficient in testing than those from other programs. In both psychology and social work, the extent to which organic illnesses are addressed in academic and clinical training vary from school to school and depend upon the setting where the student completes the clinical aspects of his or her training. The range of patients and disorders, as well as the range of therapeutic techniques to which psychology and social work students are exposed during their clinical training varies depending upon training site, supervisors, amount of available interdisciplinary contacts and the demographics of the site’s patient population. Among the mental health professions, it is only psychiatrists who have that broad range of academic and clinical training and experience, which the legislature has recognized by giving them a far more broad scope of practice.”

. In the case of GA, Mr. Bodek utilized lay observations of the defendant’s behavior by his parole officer and family prior to the instant offense, along with the results of his own examination and the laboratory test results that showed he was infected with HIV and when diagnosed had an extremely high viral load, to diagnose the defendant as having been suffering from an HIV induced delirium superimposed on an HIV induced dementia at the time of the offense. The psychiatrist and internists who had examined the defendant prior to the instant offense and the psychiatrists, neurologists and internists who evaluated and treated him after his arrest had indicated that he merely suffered from a dementia and failed to diagnose the delirium. Thus, Mr. Bodek was able to diagnose properly the delirium, a mental disorder that is by definition an organic illness, without having to first have it diagnosed by a physician.
In this court’s experience, there have been a number of occasions where defense counsel have complained about the health complaints and conditions of their defendants in jail and in the community. This court (and other judges in cases before them) has appointed Mr. Bodek to evaluate these situations as the court’s expert. He has found, by taking an appropriate history and review of symptoms presented by these defendants and then arranging to have them properly assessed based on his findings and resultant concerns, that they have serious physical illnesses (including, having a bullet unknowingly left in a gunshot victim that was pressing on his spinal cord and causing sensory and motor deficits, an arteriovenous malformation in the brain, lung cancer, seri *204 ous cardiac problems, bladder cancer, lead poisoning, serious thyroid dysfunction and other illnesses) that were only evaluated and treated after he became involved and which the physicians who had evaluated these defendants, both in the community and in jail, had failed to discern.
Historically, clinical social workers, who are often the only health care professionals whom economically disadvantaged or chronically mentally ill persons have regular contact with, are the first to identify potential physical health problems and based on their concerns to arrange for appropriate evaluation and treatment of these persons.
In this regard, one must not forget that the biopsychosocial approach to the evaluation of physical and mental disorders and dysfunction is, by definition, an interdisciplinary one. It does not replace physicians with psychologists and licensed clinical social workers. (See, n 27, supra.) And, clinical social workers have historically been the leaders in facilitating interdisciplinary collaboration with physicians and other health care professionals. (See, n 29, supra.)